Thomas Holme Building and Loan Assn. *v.* New Amsterdam Casualty Co., Appellant.

Argued October 13, 1936.

Before Keller, P. J., Cunningham, Baldrige, Stadtfeld, Parker, James and Rhodes, JJ.

*Raymond A. White, Jr.,* for appellant.

*J. Kennard Weaver,* for appellee.

OPINION BY STADTFELD, J., December 11, 1936:

This is an action in assumpsit to recover $1,000 on a bond issued by the New Amsterdam Casualty Company as surety, inuring to the benefit of the plaintiff, Thomas Holme Building and Loan Association, for any act of fraud, dishonesty, larceny, etc. committed by William B. Clare as Secretary of the plaintiff association, said bond being dated January 8, 1927. The plaintiff association suffered a loss in excess of $1,000 and notified the New Amsterdam Casualty Company, the defendant, by telegram dated September 22, 1933, and by letter dated the same day, which telegram and letter were received by the defendant.

The defendant filed an affidavit of defense. The defense was that the plaintiff association had knowledge, more than ten days previous to the time of sending the telegram and letter to the said defendant, of the acts of fraud, dishonesty, larceny, embezzlement, forgery, misappropriation, wrongful abstraction or wilful misapplication committed by William B. Clare. Paragraph two of the said bond provides: "The employer shall, within ten days after the discovery of a loss hereunder, notify the surety thereof by telegram addressed to it at its principal office in the City of Baltimore, Maryland."

The case was tried before KNOWLES, J. and a jury, on November 26, 1935, and the jury rendered a verdict in favor of the plaintiff in the sum of $1,126.16.

The defendant filed a point for binding instructions, which was overruled. Motion for judgment n. o. v. was overruled in an opinion by LEWIS and KNOWLES, JJ., and judgment entered on the verdict.

From the testimony it appears that because of certain irregularities in the keeping of his books by Mr. Clare, this matter was referred to the State Banking Department by plaintiff association in July, 1933, and

an investigation was conducted by a Mr. McManus an examiner of said department. It took Mr. McManus two months to complete the investigation and he reported to the association at its meeting on September 18, 1933, the third Monday of September, that it had suffered losses by reason of the actions of Clare, the Secretary. The telegraphic notice was thereupon sent to the defendant, four days later.

Mr. Knauer, solicitor for plaintiff association, testified that the receipt of the report of Mr. McManus at this meeting in September, was the first definite information that there were actual peculations or embezzlements by Mr. Clare as Secretary.

On cross-examination of this witness, it appeared that at a meeting of the association on July 22nd or 23rd, there was a discussion of a matter which occurred between the Secretary and the Northeast National Bank—a pledging of stock for a loan he had with the bank. At that time, the witness testified there was no knowledge or information as to anything wrong with Mr. Clare's books as secretary to the Association. At this meeting, the witness stated that they were not positive, but very suspicious that the pledge made by Mr. Clare was fictitious. This transaction with the bank, however, did not and could not occasion any loss to the association. He further testified in August, Mr. McManus did report as to irregularities in the way Mr. Clare handled his books as secretary.

It appeared that one of the losses reported to the Association by the State Banking Department on Sept. 18th, 1933, was the loss of $1,796.95, which was paid on October 19, 1931, to the Secretary of the Association, who is guilty of the embezzlement, to satisfy a mortgage held by the Association on premises 4218 Decatur Street, Philadelphia. The books of the Association were so manipulated by Clare that this taking by him was not shown, but thereafter it seems that a

report of the Association did show a loss suffered by the Association when certain of their property was omitted from the report. Where the money went, the witness testified he didn't know until after the report came from the Banking Department.

Thomas B. McManus, examiner for the State Banking Department, testified that he had the books and records of the association in his possession from July 24th until at the October meeting, the third Monday of October, when he turned them over.

During his cross-examination he was asked: "Q. In other words, you knew at the August meeting that he was guilty of the crimes of embezzlement and peculations? A. I had my suspicions, but I didn't find them correct until a little later on. I think it was the following meeting when I informed Mr.—I don't know whether it was Mr. Knauer or Mr. Weaver—it was one of them at the meeting—I think it was Mr. Knauer at the September meeting—and I told him to send a telegram to the Company, which he did that morning."

Knauer and McManus were the only witnesses on behalf of plaintiff association.

On behalf of defendant, L. Northrup Castor, conveyancer and a director of plaintiff association was called. He testified in part as follows: "Q. When was the first time that any losses were reported to the Association? A. My understanding was—Q. Tell us when? A. In that September meeting. Q. What date was that meeting? A. I am not positive; I believe it was the 3rd of September (Evidently the third Monday of September is intended)."

There was also offered in evidence, a statement signed by the witness dated January 12, 1934, reading as follows: "I, L. Northrup Castor, am the conveyancer of the Thomas Holme B & L Ass'n. I do know Wm. B. Clare who was the secretary of the B & L Association. In December of 1932 Clare came to my father

who is Treasurer of the Association and asked him for his canceled check and stubs in order to make the audit. Repeated efforts were made by my father and self to get the canceled check and stubs back and we were unsuccessful until January, 1933, during the late part of the month. My suspicions were then aroused but of course had no grounds or anything on him but we did decide to watch him closely. We had a meeting of the board of directors in May 1933 on the 2nd floor of this Holme Theatre and at that time I grabbed a report of the Banking Department which revealed that one of the homes we were interested in, was marked as abandoned. I called this to Clare's attention and he said it was just an error and would have it corrected. Clare would never permit anyone to examine this report. I am a director in the Northeast National Bank and at a meeting one day learned Clare had security pledged of some double share of the Thos. Holme B. &. L. Ass'n. and this I knew was incorrect. This was sometime in June 1933. At the next meeting of the association Clare admitted the security of B & L stock he pledged with the bank was "phony" and suggested we get private auditors to examine his accounts but it was decided then to refer the entire matter to the State Department of Banking which we did. Clare on the 7-22-33 meeting was asked to resign. We all then knew Clare was crooked, that he kept false books and embezzled money. (signed) L. Northrup Castor." This witness further testified that the association had an annual audit made by an auditing firm—C. P. A., in Philadelphia, and nothing wrong as to the Secretary was shown by the reports.

Frank G. Castor, Treasurer of plaintiff association, called on behalf of defendant company, testified that the amount of $1,798.85, the item of October 19, 1931, was not on his monthly report and had never been received by him.

Dr. William A. Bennett, President of plaintiff association, called as a witness on behalf of defendant company, testified in part as follows: "By Mr. Weaver: Q. Just a minute, Doctor; when was the first time that any loss was reported to the Building and Loan Association by anyone? A. Definitely? Q. Yes, loss. A. It seems to me that it was at the regular meeting in September. Mr. McManus said he thought he had found enough to warrant the Building and Loan Association to go on and notify the bonding company. Q. That was at the September meeting; the regular meeting in September? A. Yes. Q. About September 18th. A. About that time; the third Monday of September."

Charles B. Heston, a director of plaintiff association, was called as a witness by defendant company. He testified that he was present at the meeting of the Board of Directors in July, 1933, when Clare, the Secretary, said that he had wrongfully used some B. &. L. stock, pledging a fictitious entry at the Northeast National Bank as a collateral for a loan. There was, however, no loss to plaintiff association.

It was admitted by defendant company that there were total losses to the association in the sum of $15,-551.11.

The trial judge submitted to the jury, in a full and comprehensive charge, the question as to whether the notice required by the terms of the bond was sent in the time required. No exception was taken to the charge by either side and no new trial was asked for by defendant company. The sole question is whether under the testimony, defendant was entitled to binding instructions.

It is substantially claimed on behalf of defendant company that as soon as the officials of plaintiff association had any suspicions as to whether or not their Secretary was honest in all of his dealings, they should

have sent notice as required by the terms of the bond.

It was the testimony of all the witnesses, both for plaintiff and defendant, that the first knowledge of any definite loss to the association was at the time of the receipt of the report of the examiner for the Banking Department at the meeting in September, 1933. None of the annual reports of the auditing firms engaged by plaintiff had disclosed any embezzlement or loss.

The question of when plaintiff discovered any *loss* was under the testimony, a question of fact for the jury, which found for plaintiff.

It will be observed that the terms of the bond require notice "within ten days after *discovery of a loss*," not when suspicions may be aroused. (Italics supplied).

The principle appliable to the present case is set forth in 50 Corpus Juris, par. 277, page 171, as follows: "Time for Notice. ...... The time does not begin to run against the obligee until he knows, or has had reasonable opportunity to know, of the principal's default, and knowledge within the meaning of this rule is actual knowledge," citing *Wait v. Homestead Bldg. Assoc.* 76 W. Va. 431.

In the cases of *American Surety Co. v. Pauly* (No. 1) 170 U. S. 133 (1897) and *Fidelity & Deposit Co. of Maryland v. Bates,* 76 F (2nd) 160 (1935), it was held that the duty of the obligee to notify the surety arises only when the obligee is satisfied that a default has actually taken place; he is not required to notify the surety of mere suspicious dishonest conduct on the part of the principal.

"...... At common law, and under statutes declaratory thereof, the rule that the surety is a favorite of the law and that his contract must be strictly construed does not apply to surety companies organized to make bonds or undertakings for a profit, or to a

compensated surety: " 50 Corpus Juris, 81, citing, inter alia, *Franklin Borough M. E. Church v. Equitable Surety Co.,* 269 Pa. 411, 112 A. 551; *Brown v. Title Guaranty, etc. Co.,* 232 Pa. 337, 81 A. 410, 411; *Philadelphia v. Fidelity & Deposit Company of Maryland,* 231 Pa. 208, 80 A. 62, 63; *Young v. American Bonding Co.,* 228 Pa. 373, 77 A. 623, 626; *Cohn v. Maryland Casualty Co.,* 88 Pa. Superior Ct. 182; *Philadelphia v. Fidelity & Deposit Company of Maryland,* 46 Pa. Superior Ct., 313.

"The contract should be most strongly construed in favor of insured and against the compensated surety:" 50 C. J. 83, citing interalia, *South Philadelphia State Bank v. National Surety Co.,* 288 Pa. 300, 135 A. 748; *Brown v. Title Guaranty Co.,* 232 Pa. 337, 81 A. 410; *Young v. American Bonding Co.,* 228 Pa. 373, 77 A. 623; *Philadelphia v. Fidelity & Deposit Company of Maryland,* 46 Pa. Superior Ct. 313.

After a careful examination of the entire record, we find nothing that would justify a reversal of the judgment.

Judgment affirmed.