E. UDOLF, INC. *v.* AETNA CASUALTY AND
SURETY COMPANY ET AL.
(13838)

SHEA, CALLAHAN, GLASS, HULL and F. X. HENNESSY, Js.

Argued March 1—decision released May 1, 1990

*William F. Gallagher,* with whom, on the brief, was *Gwen B. Weltman,* for the appellant (plaintiff).

*John T. Harris,* with whom, on the brief, were *Gregory T. D'Auria* and *Peter R. Reynolds,* for the appellees (named defendant et al.).

*Henry C. Ide,* for the appellee (defendant Fire and Casualty Insurance Company of Connecticut).

HULL, J. The sole issue in this appeal is whether the plaintiff, E. Udolf, Inc., was entitled to coverage under certain employee dishonesty insurance policies issued by the defendants, Aetna Casualty and Surety Company (Aetna) and Fire and Casualty Insurance Company of Connecticut (Fire and Casualty), for the

misappropriation of monies by an employee of the plaintiff. The plaintiff notified the defendants of losses it had incurred as a result of an employee's dishonesty and sought from the defendants indemnification, plus interest, for those losses. Upon the defendants' refusals to pay its claim, the plaintiff instituted the present action. The matter was thereafter tried to the court and judgment was rendered in favor of the defendants. From this judgment the plaintiff appeals. We find no error.

The underlying facts as found by the trial court are as follows. The plaintiff is a small corporation that operates a retail men's clothing store in the city of Hartford. During the relevant period, 1980 through 1983, the plaintiff employed between eight and ten employees. The only officer, director and shareholder of the plaintiff was Leonard Udolf, who was present in the store approximately 10 to 20 percent of the time. In his absence the store was run by Kenneth Auer, the store manager. Auer was the overseer of the store and was principally in charge of its operations in the absence of Leonard Udolf. He was expected, however, to report all relevant activities to Leonard Udolf.

During the years 1980 and 1981, Lynn Bjork, an employee of the plaintiff, misappropriated $6000 from the plaintiff. To effect the misappropriations, she substituted her personal checks for money generated by the plaintiff's sales, and then simply put these checks in her desk rather than depositing them into the plaintiff's account. In the spring of 1981, during one of Leonard Udolf's frequent absences from the store, Anna Shukis, the plaintiff's bookkeeper, discovered the misappropriations and immediately informed Auer of them. Auer and Shukis were expected to inform Leonard Udolf of activities such as Bjork's misappropriations. They, however, did not consult with Leonard

Udolf, but rather agreed with one another to allow Bjork to repay the $6000 and remain employed by the plaintiff. Thereafter, Bjork repaid the $6000.

Beginning in late 1981, and continuing until February, 1983, Bjork again misappropriated monies from the plaintiff, totaling $48,715.08. These misappropriations were discovered in February, 1983, and Bjork was immediately fired by Auer on the direct order of Leonard Udolf.

Pursuant to employee dishonesty insurance policies that the plaintiff had purchased from Aetna and from Fire and Casualty,[1] the plaintiff notified the two companies of the losses incurred as a result of Bjork's misappropriations. Both Aetna and Fire and Casualty refused to indemnify the plaintiff for those losses, claiming that the language of the policies excluded coverage for Bjork's actions. Aetna's refusal to pay was based on the following provision contained in section 7 of its policy: "The coverage of Insuring Agreement I shall not apply to any Employee from and after the time that the Insured or any partner or officer thereof not in collusion with such Employee shall have knowledge or information that such Employee has committed any fraudulent or dishonest act in the service of the Insured or otherwise, whether such act be committed before or after the date of employment by the Insured." Fire and Casualty's refusal was based on similar language contained in section 1 (3) of its policy: "Insurance hereunder shall be deemed cancelled as to any Employee immediately upon discovery by the Insured, or any partner or officer, of any fraudulent or dishonest act of such Employee."

---

[1] The Aetna policy covered the period 1969 through November 22, 1982, and the Fire and Casualty policy covered the period November 1, 1982, through October 31, 1983.

The trial court concluded that, under the terms of the policies, the plaintiff was not entitled to recovery of the losses it had incurred as a result of Bjork's actions. The basis of the court's conclusion was its determination that the knowledge of Auer and Shukis concerning misappropriations committed by the plaintiff's employees was imputed to the plaintiff. The court thus reasoned that because the 1980-81 misappropriations by Bjork constituted "fraudulent or dishonest act[s]" within the scope of section 7 of Aetna's policy, and section 1 (3) of Fire and Casualty's policy, and because the plaintiff, by imputation of Auer's and Shukis' knowledge, became aware of those misappropriations no later than the summer of 1981, any subsequent losses caused by a "fraudulent or dishonest act" on the part of Bjork were excluded from coverage under the policies. In so concluding, the court rejected the plaintiff's claim that, because Auer and Shukis did not inform Leonard Udolf of Bjork's 1980-81 misappropriations, they were in collusion with Bjork. The court stated that while the failure of Auer and Shukis to notify Leonard Udolf may have been an act of poor judgment, it was not a fraudulent act and therefore was not collusive.

On appeal, the plaintiff claims that the trial court erred in: (1) imputing to the plaintiff the knowledge of Auer and Shukis concerning Bjork's prior misappropriations of the plaintiff's monies; (2) finding that Bjork's prior misappropriations were "fraudulent or dishonest" under the terms of the policies; and (3) finding that Auer and Shukis were not in collusion with Bjork.

I

We first consider whether the trial court erred in imputing to the plaintiff the knowledge of Auer and Shukis concerning Bjork's prior misappropriations of the plaintiff's monies. The plaintiff concedes that gen-

erally, " ' "notice to, or knowledge of, an agent while acting within the scope of his authority and in reference to a matter over which his authority extends, is notice to, or knowledge of, the principal." 2 Mechem on Agency (2d Ed.) § 1803.' *Lane* v. *United Electric Light & Water Co.,* 88 Conn. 670, 674, 92 A. 430 (1914); *Reardon* v. *Mutual Life Ins. Co.,* 138 Conn. 510, 516, 86 A.2d 570 (1952)." *West Haven* v. *United States Fidelity & Guaranty Co.,* 174 Conn. 392, 395, 389 A.2d 741 (1978). As stated in the Restatement (Second) of Agency § 272, "a principal is affected by the knowledge of an agent concerning a matter as to which he acts within his power to bind the principal or upon which it is his duty to give the principal information." The plaintiff argues, however, that this agency principle should not apply in the context of employee dishonesty insurance, citing as authority for its position *American Employers' Ins. Co.* v. *Cable,* 108 F.2d 225 (5th Cir. 1939), *Miami National Bank* v. *Pennsylvania Ins. Co.,* 314 F. Sup. 858 (S.D. Fla. 1970), *Phoenix Indemnity Co.* v. *Union Finance Co.,* 54 So. 2d 188 (Fla. 1951), and *Peurifoy* v. *Loyal,* 154 S.C. 267, 151 S.E. 579 (1930).

The trial court was unpersuaded by the plaintiff's argument and the cases on which it was based, and relied instead primarily on *Ritchie Grocer Co.* v. *Aetna Casualty & Surety Co.,* 426 F.2d 499 (8th Cir. 1970), in concluding that the knowledge of Auer and Shukis concerning Bjork's 1980-81 activities should be imputed to the plaintiff. The similarities between *Ritchie Grocer Co.* and the instant case are striking. At issue in *Ritchie Grocer Co.* was the same policy exclusion as in the present case: " 'The coverage of this Policy shall not apply to any Employee from and after the time that the Insured or any partner or officer thereof not in collusion with such Employee shall have knowledge or information that

such Employees (sic) has committed any fraudulent or dishonest act in the service of the Insured or otherwise . . . . .' " Id., 501.

The underlying facts involved in *Ritchie Grocer Co.* were as follows. Joseph Polk, the manager of a branch office of the plaintiff's wholesale grocery business, received an application for employment from Wayne Kemp. Prior to hiring Kemp, Polk inquired into Kemp's reputation for trustworthiness and discovered that several months earlier Kemp and two other boys had broken into a gas station and had stolen some tires and money. Notwithstanding that information, Polk hired Kemp as a truck driver for the plaintiff. Id., 501–502. During the eighteen months that Kemp was employed by the plaintiff, he misappropriated $17,486.20, for which the plaintiff made a claim under its fidelity policy. Id., 503. The insurance company defended on the grounds that Polk's knowledge of Kemp's prior "fraudulent or dishonest" act made him a known risk and excluded him from coverage under the policy's terms. Id., 501. The District Court held in favor of the insurance company on this ground and the Eighth Circuit Court of Appeals affirmed, reciting the general agency principle that knowledge of an agent acquired in the ordinary discharge of his duties for the corporation is generally to be imputed to the principal. Id., 500.

The trial court in the present case also relied on *Alfalfa Electric Cooperative, Inc.* v. *Travelers Indemnity Co.,* 376 F. Sup. 901 (W.D. Okla. 1973), as support for its decision to impute to the plaintiff the knowledge of Auer and Shukis. In *Alfalfa Electric Cooperative, Inc.,* the court imputed to an employer the knowledge of an office manager concerning prior fraudulent or dishonest acts of an employee. Id., 907.

The cases relied upon by the trial court and the cases cited by both the plaintiff and the defendants lack any

meaningful analysis of the reasons that imputation was either appropriate or inappropriate under the facts of the particular cases. We conclude, however, that a proper analysis flows logically from the tension between the conflicting views presented by the plaintiff and the defendants. The plaintiff argues that the general rule imputing knowledge of an agent to a principal presumes the agent's loyalty in the performance of his duties. The corporation purchases fidelity insurance to protect itself from the risk that the employee will be disloyal. The plaintiff claims that it, therefore, would be "absurd" to hold that each employee so insured was an agent of the plaintiff whose duty it was to discover and report acts of dishonesty by other employees. Moreover, the plaintiff argues, if the neglect or reluctance of the insured's employees to report on one another relieved the insurance carrier of its liability, the corporation would be denied a remedy. The defendants' counterpoint is that, taken to its extreme, the plaintiff's contention would render "prior employee dishonesty" exclusions useless. Without employee imputation, the defendants argue, it would be impossible to charge an insured corporation with knowledge of an employee's prior wrongful actions.

The answer to this conundrum can be found in the cases relied upon by the trial court, although not explicitly articulated therein. We conclude that the knowledge of an employee may be imputed to an employer under an employee dishonesty insurance policy if the employee holds a position of management or control in the exercise of which a duty to report known dishonesty of a fellow employee can be found to exist either explicitly or by fair inference from a course of conduct. " 'The knowledge of individual officers and employees at a certain level of responsibility will be deemed the knowledge of the corporation; where the level of responsibility begins must be discerned from

the circumstances of each case. . . .' " *Gordon Sel-Way, Inc.* v. *Spence Bros, Inc.,* 177 Mich. App. 116, 124, 440 N.W.2d 907 (1989), quoting 18B Am. Jur. 2d, Corporations § 1673, pp. 524–25.

On appeal, the plaintiff argues that the evidence presented at trial indicated various limitations on the responsibilities of Auer and Shukis that made imputation inappropriate. The trial court, however, concluded that Auer was principally in charge of operations during Leonard Udolf's absences from the store and that one of his responsibilities in that capacity was to report matters such as misappropriations to Leonard Udolf. The court further determined that Anna Shukis, the plaintiff's bookkeeper, was responsible for running the bookkeeping operation and that she likewise had a responsibility to report to Leonard Udolf any misappropriations that occurred in that department. The nature and extent of an agent's authority is a question of fact for the trier. *E. Paul Kovacs & Co.* v. *Alpert,* 180 Conn. 120, 126, 429 A.2d 829 (1980). "[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

Bjork testified at trial that in 1980-81, Auer's position was that of "store manager." Although Auer testified at trial that he was only the "sales manager," this testimony was inconsistent with his prior deposition testimony in which Auer had claimed that he was in fact the "store manager." Further, while Auer stated that he did not have the authority to hire and fire employees in 1980-81, he did arrange with Bjork, without first consulting with Leonard Udolf, for repayment

of the $6000 and then fired Bjork upon learning of the 1983 misappropriations. Auer's testimony also revealed that he was expected to report to Leonard Udolf everything that happened in the store. Finally, Leonard Udolf was present in the store only 10 to 20 percent of the time. Although Leonard Udolf claimed at trial that he was always in charge of the store, even while absent, this claim conflicted with his deposition testimony in which, in response to the question of "who was in charge of the operations in your absence," he answered: "Well I felt I had them in capable hands with Ken Auer . . . on the floor . . . and in the office with Ann Shukis and the other girls."

We conclude that the trial court's factual findings concerning the responsibilities and consequent duties of Auer and Shukis were supported by the evidence. See *Pandolphe's Auto Parts, Inc.* v. *Manchester,* supra. Therefore, since the court found that the positions held by Auer and Shukis gave rise to a duty to report misappropriations to Leonard Udolf, the court's imputation to the plaintiff of Auer's and Shukis' knowledge concerning Bjork's 1980-81 actions was not error.

## II

The plaintiff next claims that the trial court erred in concluding that Bjork's 1980-81 misappropriations of the plaintiff's $6000 were "dishonest or fraudulent" under the terms of the policies. The gravamen of this claim is that Bjork had deposit slips and personal checks that accounted for all the money she had taken from the plaintiff and that she eventually paid back that money. The plaintiff states in its brief that "[i]n 1980 and 1981 [Bjork] merely withheld cash deposits, carefully accounting for the amounts so withheld." According to the plaintiff, while Bjork's acts may have been unauthorized, they were not dishonest within the context of the policies. We are unpersuaded.

Justice Cardozo wrote the following in *World Exchange Bank* v. *Commercial Casualty Ins. Co.*, 255 N.Y. 1, 5, 173 N.E. 902 (1930): "Dishonesty, unlike embezzlement or larceny, is not a term of art. Even so, the measure of its meaning is not a standard of perfection, but an infirmity of purpose so opprobrious or furtive as to be fairly characterized as dishonest in the common speech of men." To claim that Bjork's program of self-service with respect to the plaintiff's money was not fraudulent or dishonest defies common sense and "the common speech of men." Moreover, we refuse to hold that it is a defense to a claim of dishonesty that a person so accused was dishonest in a very efficient manner. Accordingly, the trial court did not err in concluding that Bjork's 1980-81 actions were "dishonest or fraudulent" under the terms of the policy.

### III

We turn now to the plaintiff's final claim of error. Section 7 of the Aetna policy excluded from coverage "any Employee from and after the time that the Insured or any partner or officer thereof *not in collusion with such Employee* shall have knowledge or information that such employee has committed any fraudulent or dishonest act . . . . " (Emphasis added.) The plaintiff argues that the court erroneously found that Auer and Shukis were not in collusion with Bjork. In finding that no collusion had occurred, the trial court relied upon the definition of "collusion" contained in Black's Law Dictionary (5th Ed. 1979) p. 240: "An agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law." The plaintiff contends that this definition is too narrow and that the court erred in not applying a broader definition of "collusion" such as that contained in Webster's Third New International Dictionary (Unabridged Ed. 1966) in which "collude" is defined as "to connive with another: CONSPIRE, PLOT."

752

Initially, we note that the plaintiff does not argue that the facts found by the trial court fail to support a finding of collusion under the definition given in Black's Law Dictionary; nor does the plaintiff assign as clearly erroneous the court's factual findings on this issue. Rather, the plaintiff argues solely for a broader definition of collusion than that relied upon by the trial court.

The simple answer to this claim is that the plaintiff cited to the trial court, in its amended trial memorandum dated December 15, 1988, the very definition of collusion that the court applied. Unhappy with the result, however, the plaintiff now asks that we apply to the facts of this case a different definition of the word "collusion." We refuse to do so. A party may not secure a reversal on the basis of any invited error. See, e.g., *State* v. *Smith,* 212 Conn. 593, 611, 563 A.2d 671 (1989); *State* v. *Brokaw,* 183 Conn. 29, 33, 438 A.2d 815 (1981).

There is no error.

In this opinion the other justices concurred.