**NORTHWOOD NURSING AND CONVA-
LESCENT HOME, INC. and Nurse-
care Health Centers, Inc.**

v.

**The CONTINENTAL INSURANCE
COMPANY.**

**No. 94–CV–6706.**

United States District Court,
E.D. Pennsylvania.

Oct. 20, 1995.

80

Lloyd A. Gelwan, Hoyle, Morris & Kerr, Philadelphia, PA, for plaintiffs.

Edward C. Mengel, Jr., John Ashbrook, Robin H. Rome, White and Williams, Philadelphia, PA, for defendant.

## MEMORANDUM

JOYNER, District Judge.

Today this Court considers Defendant Continental Insurance Company's Motion for Summary Judgment. Continental is being sued by Nursecare Health Centers, Inc. and its subsidiary, Northwood Nursing and Convalescent Home, Inc., for the coverage they allege they are due under insurance contracts Continental issued to Northwood from October, 1991 through April, 1993. The following facts are uncontested unless otherwise noted.

Northwood is a nursing home in Pennsylvania. In 1990, Northwood's parent, Nursecare, arranged to sell Northwood to a company called Realty–Vest Financial Corporation. Realty–Vest is owned by Francis Hayman, Jr. To effect the sale, Nursecare transferred its shares in Northwood to Realty–Vest with the understanding that Realty–Vest would obtain financing for the purchase and pay for the stock then. By early 1993, Realty–Vest had still not closed the purchase and Nursecare repossessed Northwood.

During the three years and two months that Realty–Vest owned Northwood, Hayman was the sole director and President of Northwood. Soon after the purchase, Hayman arranged for Northwood to be covered under the multi-peril package policy he had with Pacific Employers Insurance Company. In October, 1991, Hayman's insurance broker transferred this coverage to Continental (the Policy). According to Plaintiffs, Nursecare and its President, James Hubbert, were unaware of this change until several months later and despite repeated requests, did not receive a complete copy of the Policy until 1994.

Pursuant to the sale agreements, Nursecare had the right to direct the operations at Northwood and receive monthly financial statements and other reports until closing. In addition, Hubbert, Northwood's former President, was barred from Northwood's premises. Plaintiffs allege that Realty–Vest and Hayman did not cooperate with Nursecare and did not regularly forward financial reports to it. Plaintiffs also allege that the financial information they did receive was

often incomplete and unreliable. In 1992, Hubbert sent Nursecare's Controller to Northwood to attempt to obtain financial information, but because of the alleged disarray of the records, a complete review of Northwood's finances was not possible.

Partially as a result of the above, Hubbert became concerned about Hayman's management of Northwood soon after the purchase. Hubbert confronted Hayman on a number of occasions from 1990 through 1993 to discuss excess payment of management fees, missing petty cash, Northwood's faulty billing procedures and problems with employee insurance benefits. Hubbert testified that he told Hayman that he considered the manner in which Hayman ran Northwood as stealing from Northwood. Hubbert accused Hayman of misappropriating funds and reported these concerns not only to Hayman, but also to Hayman's attorney, Nursecare's Board of Directors and Hubbert's own attorneys.

Hayman acknowledged that some fees in excess of those agreed upon had been paid out. However, Hayman denied that this was improper, asserted that they were only loans and reassured Hubbert that he would repay the loans at closing. Indeed, Hayman repaid Nursecare over $100,000 in August, 1992.

In early 1993, Nursecare and Hubbert allegedly discovered Hayman and Realty-Vest's gross mismanagement of Northwood for the first time during a tour of the facility. The mismanagement included physical defects so serious that the facility's State license was threatened. As a result of this discovery, Nursecare sought and received State permission to terminate the Stock Purchase Agreement and repossess Northwood. Once on the premises, Plaintiffs allegedly discovered outright fraud and embezzlement by Hayman and Realty-Vest.

Within two weeks of regaining ownership, Plaintiffs put Continental on notice of the variety of losses they contend are covered under the Policy. These include building and property damage and employee dishonesty losses. Continental contends these are the same issues of which Hubbert complained to Hayman and others as early as 1990.

## STANDARD OF REVIEW

In considering a motion for summary judgment, a court must consider whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must determine whether the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In making this determination, all of the facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in favor of the non-moving party. *Id.* at 256, 106 S.Ct. at 2514. Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must establish the existence of each element of its case. *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)).

## DISCUSSION

■ Many of Continental's arguments concern the date by which Plaintiffs discovered Hayman's alleged dishonesty. The date of discovery is relevant to several issues, including the Policy's notice and suit periods, whether the losses were fortuitous and whether certain Policy provisions were canceled as a result of the insured's discovery of dishonesty. Because of our holding below, we only address the first issue, whether Plaintiffs complied with the Policy's notice and suit limitation provisions.

The Policy's Crime General Provisions require that after the insured "discover[s] a loss or a situation that may result in loss of, or loss from damages to, Covered Property [the insured] must: Notify [Continental] as soon as possible." That section also precludes any legal action against Continental unless it is brought within two years from the date the insured discovers the loss. The Policy's Employee Dishonesty Losses Cover-

age requires "notice as soon as possible of any loss of the type insured under this Coverage Form." Employee Dishonesty comprises the bulk of the losses for which Plaintiffs seek recovery. Armed with these provisions, Continental argues that this action is untimely because notice was not given as soon as possible, nor was suit brought within two years of discovery of the loss.

Continental asserts that Plaintiffs discovered Hayman's dishonesty by mid–1990. To support this assertion, Continental proffers the Proof of Loss Forms that Plaintiffs filed with Continental in November, 1993. Two of the six Forms state under oath that Plaintiffs discovered the relevant losses on June 15, 1990. The other forms indicate dates of discovery in 1993. In addition, Continental proffers Hubbert's testimony that from 1990 on, he repeatedly told Hayman that he considered Hayman's use of Northwood funds misappropriations from Northwood. Hubbert also testified that he repeated this to his attorney, Hayman's attorney, and Nursecare's Board of Directors. Hubbert Dep. at 661, 685, 687.[1]

Continental asserts that this evidence proves that Plaintiffs discovered the losses in 1990 and yet did not notify Continental until three years later, nor bring suit for four years. At the very least, Continental argues, Plaintiffs discovered a "situation that may result in loss" in 1990, which needed to be reported to Continental as soon as possible.

In contrast, Plaintiffs argue that their claims are not barred by the notice and suit provisions in the Policy. Most of Plaintiffs' arguments go to rebut Continental's assertion that they discovered the losses in 1990. They assert that their first date of discovery was 1993. We address each of their arguments below, but in different order than that presented to us.

First, Plaintiffs assert that whether Hayman's conduct was dishonest is an objective question.[2] *J.T. Moran Fin. Corp.*, 147 B.R.

335, 339–40 (Bankr.S.D.N.Y.1992). For this reason, Plaintiffs disagree that Hubbert's "stealing" statements prove discovery in 1990. They argue that even if Hubbert subjectively believed that Hayman was dishonest in 1990, if the objective proof did not demonstrate this dishonesty, then they could not discover the dishonesty until 1993, when it was objectively proven. Plaintiffs also argue that the "stealing" statements do not demonstrate subjective belief of theft. They explain that Hubbert simply used rough colloquialisms and strong language to catch Hayman's attention.

Plaintiffs argue that the objective evidence shows that they did not discover the theft until 1993 when Hayman refused to repay his "loans." Hubbert Dep. at 683, 691. For example, until the deal fell apart, Plaintiffs believed that Hayman was going to repay the loans at settlement and received assurances from investment bankers that Hayman could get the funding he needed to close the sale. It was only in 1993, they argue, when Hayman refused to repay the loans that his actions were converted to theft. *Id.* at 663, 665–66, 683. Plaintiffs point out that it would not have made sense for them to think that Hayman was stealing from the very company he was in the process of buying, especially since Hayman repaid over $100,000 in 1992. These facts, Plaintiffs argue, show that there was no way for them to objectively determine that Hayman was stealing from them until 1993, at which time they gave Continental prompt notice.

We find that for the purposes of this motion, the evidence objectively demonstrates that Hayman's actions were dishonest. *J.T. Moran*, 147 B.R. at 339–40. The evidence shows that Hayman was not authorized to use Northwood's funds for his own purposes and that this use was a source of concern to Nursecare's Board of Directors. Hubbert Dep. at 661. Plaintiffs offer no evidence that they ever offered to loan Northwood's money to Hayman. Rather, their evidence shows

---

1. On October 6, 1995, Defendant filed a Motion to Suppress James Hubbert's Deposition Errata Sheet. We have not yet ruled on that Motion and so will only rely on the portions of the deposition not affected by that Motion.

2. Plaintiffs do not argue that Hayman was not dishonest, so for summary judgment purposes there is no issue of fact as to this question. Plaintiffs' arguments concern the date they discovered Hayman's dishonesty.

that once faced with the discovery that he was using money anyway, they decided to treat it as a loan in hope of having it repaid. *Id.* at 684, 689. Hubbert testified that he never believed that Hayman's position that he was permitted to use the funds was a legitimate one. Hubbert Dep. at 82, 661, 689, 691 ("I believe at the time I probably did think he was misappropriating the funds"). That Hayman convinced Plaintiffs that he would repay the money does not affect the objective fact that, according to Plaintiffs, Hayman was not authorized to use those funds. This use, therefore, was dishonest from the start, not just when Hayman ultimately did not repay the money.

This situation is similar to the one in *Ciancetti v. Indemnity Insurance Co.,* 168 Cal. App.2d Supp. 785, 335 P.2d 1048 (1959). There, an employee took twenty dollars from his employer's cash drawer without permission. When the employer confronted the employee, the employee repaid the money and the employer termed the employee's act a simple borrowing. Later, the employee stole more money, did not repay it and the employer submitted a claim for loss to her insurance company. The Court held that plaintiff's "statement that she did not consider [defendant's] acts to be dishonest can in no way change an act of embezzlement into an act of borrowing. It also might be well to note that before [defendant] could borrow plaintiff had to be lending." *Id.* 335 P.2d at 1049. Accordingly, the court granted summary judgment for the insurer. *See also Commodore Int'l v. National Union Fire Ins. Co.,* 184 A.D.2d 19, 591 N.Y.S.2d 168, 170 (1992) ("a loss is 'discovered' once an insured has obtained facts sufficient to cause a reasonable person to recognize that there has been dishonesty or fraud resulting in loss"); *E. Udolf, Inc. v. Aetna Cas. & Sur. Co.,* 214 Conn. 741, 573 A.2d 1211, 1215 (1990) (employee accounted for embezzled money by substituting her own personal checks and ultimately repaid money; Court held her actions were objectively dishonest). Like these other Courts, we find that Hayman's unauthorized actions were objectively dishonest.

■ The question then is whether Plaintiffs discovered the dishonesty before 1993. Plaintiffs assert that even if they suspected that Hayman was dishonest, they had no proof of this until 1993. They argue that "even the strongest suspicion does not amount to knowledge or discovery of dishonesty by the insured." *Northeast Lincoln–Mercury, Inc. v. Century Indem. Co.,* 181 Pa.Super. 595, 124 A.2d 420, 422 (1956) (citing *Thomas Holme Building & Loan Ass'n v. New Amsterdam Cas. Co.,* 124 Pa.Super. 187, 188 A. 374 (1936)). Nor does mere notice of financial irregularities trigger notice requirements. *Block v. Granite State Ins. Co.,* 963 F.2d 1127, 1129 (8th Cir.1992) (applying Missouri law); *see also J. Appelman, Insurance Law and Practice,* § 6197 at 379–80 (1981).

We find that although Plaintiffs may argue that they only suspected that Hayman was dishonest, in fact, they had proof that Northwood's money was being spent on unauthorized management costs as well as Hayman's personal expenses. Hubbert Dep. at 77, 661, 663, 665, 685; Hubbert Aff. at ¶ 13; Defendant's Ex. D (Plaintiffs' Proof of Loss Forms); Seitz Aff. at ¶ 5. Plaintiffs had the right to receive monthly financial statements, and did receive them, albeit often incomplete and late. Hubbert Dep. at 77, 187. Nonetheless, Hubbert and Nursecare's Controller testified that they were able to create ledger statements from those records, and it was those records that made them aware of the financial problems at Northwood. *Id.* at 77, 664. When confronted, Hayman admitted he was using Northwood's funds although he contended that his use was appropriate. *Id.* at 663, 687, 689; Hubbert Aff. at ¶ 13.

Possibly more determinative of discovery is Plaintiffs' own Proof of Loss Forms submitted to Continental. On two of the Forms Plaintiffs indicate that the losses were discovered in 1990. Plaintiffs' argument that they only gained actual proof of the theft in 1993 and that that date therefore constitutes discovery is equally unavailing. Hubbert Aff. at ¶ 23 (when Plaintiffs repossessed Northwood they discovered "solid evidence of excessive and improper payments"); *Commodore Int'l, Ltd.,* 591 N.Y.S.2d at 170

(Court rejected plaintiff's theory that discovery of loss only occurs when insured has actual facts from which amount of loss can be estimated). For these reasons, we find that Plaintiffs' own evidence proves that at the very least, they discovered a situation that may have resulted in loss in 1990.

■ Plaintiffs argue that even if this Court finds, as it has, that they discovered a situation that may result in loss as early as 1990, that this finding is not fatal to their suit under Pennsylvania law. *Brakeman v. Potomac Insurance Co.*, 472 Pa. 66, 371 A.2d 193 (1977) established the rule that when an "insurance company seeks to be relieved of its obligations under a liability insurance policy on the ground of late notice, the insurance company will be required to prove that the notice provision was in fact breached and that the breach resulted in prejudice to its position." *Id.* at 76–77, 371 A.2d at 198. The rule has recently been applied by this Court. *In re Lloyd Secs., Inc.,* 153 B.R. 677, 683 (E.D.Pa.1993).

Plaintiffs argue that Continental has not demonstrated that it suffered prejudice from any late notice. First, they assert that because Continental has consistently denied that Plaintiffs are insured under the Policy, early notice would have made no difference because Continental would just have ignored their claims for a longer period of time. Second, they argue that when Continental did receive notice they took almost no action, but only appointed an outside investigator. Plaintiffs do not argue that this is inadequate generally, but assert that here, that was Continental's sole action. Further, the outside investigator never interviewed Hayman about his alleged dishonesty or requested any information from Plaintiffs beyond what they initially supplied. Nor has Continental's internal adjuster done any follow-up on the outside investigator's progress or become aware of the nature of that investigation. Indeed, the internal adjuster has not yet made a coverage determination on the Employee Dishonesty claims and does not know when she will. Finally, Continental never physically inspected Northwood, even when warned that repairs were imminent and that evidence of loss would thereby disappear.

Plaintiffs allege that these facts demonstrate that even if they had received early notice they would have not timely investigated, and so there is no prejudice now. *Hatco Corp. v. W.R. Grace & Co.,* 801 F.Supp. 1334, 1372 (D.N.J.1992) (failure to "diligently pursue a factual investigation after its receipt of untimely notice militates against a finding that [the insurer] would have done so had timely notice been provided").

Continental argues that the late notice has prejudiced it in two ways. First, if Plaintiffs had promptly notified it of the potential for loss in 1990, the subsequent losses could have been avoided. Second, the late notice denied Continental a timely investigation. *Metal Bank v. Insurance Co.,* 360 Pa.Super. 350, 520 A.2d 493, *app. denied,* 517 Pa. 607, 536 A.2d 1332 (1987).

We find that Continental has shown prejudice. If Hubbert or Nursecare had reported a situation that may result in loss in 1990, the losses incurred after that point may have been avoided. If Continental is ultimately responsible to make good those losses, it is certainly prejudiced by having to pay more than it could have were the theft nipped in the bud.

■ We turn now to Plaintiffs' final argument, that the contractual two-year suit limitation was equitably tolled during Hayman and Realty–Vest's tenure at Northwood. As applied by this Court, the theory of adverse domination permits a statute of limitations to be equitably tolled " 'during the period that a plaintiff corporation is controlled by wrongdoers.' " *In re Lloyd Secs.,* 153 B.R. at 684 (quoting *RTC v. Gardner,* 798 F.Supp. 790, 795 (D.D.C.1992)). This theory is generally considered a part of the discovery rule and is used because controlling wrongdoers " 'are unlikely to initiate actions or investigations for fear that such actions will reveal their own wrongdoing,' " nor will outsiders generally have access to the facts from which they could discover the fraud. *Id.; see also Admiralty Fund v. Peerless Ins. Co.,* 143 Cal. App.3d 379, 389, 191 Cal.Rptr. 753 (1983). Plaintiffs argue that Hayman and Realty–Vest adversely dominated Northwood and so they were unable to discover the fraud. Be-

cause of this, they assert, we should toll the two-year limit and permit this suit.

This argument would be successful for Plaintiffs if they had demonstrated that they had no access or no meaningful access to Northwood's financial records. In fact, however, Plaintiffs' own evidence demonstrates that this was not the case. Hubbert testified that Nursecare had the right to receive financial records and reports, and did receive them, albeit often late. Hubbert Dep. at 77, 187. From these, Nursecare's Controller was able to create ledger statements that revealed misappropriated and missing funds. *Id.* at 77, 664. Because of this access, we find that Northwood was not so adversely dominated as to permit application of the adverse dominion theory.

This is a motion for summary judgment, and as such, Plaintiffs' evidence must be given credence and all inferences drawn in their favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. We find, however, that a reasonable jury could only find that Plaintiffs discovered at least a "situation that may result in loss" by 1990. The only evidence to the contrary, portions of Hubbert's deposition and affidavit wherein he avers that he did not believe that Hayman was dishonest until 1993, amounts to only a "mere scintilla." *Id.* Therefore, it is insufficient to create a genuine issue of material fact. *Martin v. Merrell Dow Pharms., Inc.,* 851 F.2d 703, 706 (3d Cir.1988). Taking Plaintiffs' evidence as true, we find that they had objective knowledge of at least a situation that may result in loss beginning in 1990, and therefore were required to give Continental notice as soon as possible and bring suit within two years. They did not and Continental was prejudiced. For all the above reasons, we grant summary judgment in Defendant's favor on all Plaintiffs' claims.