CHARLES R. HODGATE, ADMINISTRATOR (ESTATE OF TAVIS W. HODGATE) *v.* AMANDA A. FERRARO ET AL.
(AC 30239)

DiPentima, Gruendel and Lavine, Js.*

---

[8] "Colorable" is defined as "appearing to be true, valid, or right . . . ." Black's Law Dictionary (8th Ed. 2004).

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued January 11—officially released August 31, 2010

*Robert I. Reardon, Jr.,* with whom were *Kelly E. Reardon* and, on the brief, *Amanda L. Sisley,* for the appellant (plaintiff).

*Nicole C. Chomiak,* with whom, on the brief, was *Stacey L. Pitcher,* for the appellee (defendant Wellington Sales & Installation Company, Inc.).

*Ralph W. Johnson III,* with whom was *Paul D. Meade,* for the appellee (defendant Roger A. Silva).

*Opinion*

DiPENTIMA, J. The plaintiff, Charles R. Hodgate, administrator of the estate of Tavis W. Hodgate,[1] appeals from the summary judgment rendered in favor of the defendants Roger A. Silva and Wellington Sales & Installation Company, Inc. (Wellington). On appeal, the plaintiff claims that the court improperly (1) determined that Massachusetts law, rather than Connecticut law, applied to the present case, (2) concluded that no genuine issue of material fact existed and (3) prevented

---

[1] Charles R. Hodgate is the father of Tavis W. Hodgate. In this opinion, we refer to Charles R. Hodgate, administrator of the estate of Tavis W. Hodgate as the plaintiff, and Tavis W. Hodgate as the decedent.

the plaintiff from conducting discovery.[2] We are not persuaded by the plaintiff's claims and, accordingly, affirm the judgment of the trial court.

The operative complaint, filed on March 10, 2006, set forth the following allegations. Wellington, a Massachusetts corporation, employed Silva as a foreman with supervisory responsibilities and duties. On October 22, 2003, at approximately 8:30 p.m., Silva drove a van, owned by Wellington, in a northbound direction on Interstate 95 in Stonington. The decedent, who also was an employee at Wellington, was a passenger in the van. At this time, Amanda A. Ferraro was driving a motor vehicle while under the influence of alcohol in the northbound lane of Interstate 95. Her vehicle cut across travel lanes without warning, causing Silva to swerve the van. As a result, the van left the road and rolled over several times. The decedent was ejected from the van, and he suffered fatal injuries.

The complaint set forth the following causes of action relevant to the plaintiff's appeal: negligence, statutory recklessness and common-law recklessness against Silva and his employer Wellington (counts four through six); negligence, statutory recklessness and common-law recklessness against L & J Associates, Inc. (L & J),[3] another employer of Silva (counts ten, thirteen and fifteen); and negligence, statutory recklessness and common-law recklessness against Silva (counts eleven, twelve and fourteen).[4]

---

[2] The plaintiff's brief lists twenty items in the statement of issues. A careful review reveals than many of these are overlapping, repetitive and not addressed in his brief.

[3] L & J is not a party to this appeal.

[4] The complaint also alleged negligence, statutory recklessness and common-law recklessness against Ferraro (counts one through three), and recklessness against Seahorse, Inc., and Robert J. Sader, the permittee and owner of the establishment where Ferraro had been consuming alcohol (counts seven and eight). Last, the plaintiff alleged a claim for uninsured or underinsured benefits against Pilgrim Insurance Company (count nine). These defendants are not parties to this appeal.

Both Silva and Wellington raised, as a special defense, the exclusivity doctrine of the Massachusetts workers' compensation law; see Mass. Gen. Laws Ann. c. 152 (2000); which the plaintiff denied.[5] Silva filed a motion for summary judgment pursuant to Practice Book § 17-44 et seq. The basis for this motion was that the plaintiff's claims against him were barred by Massachusetts law, which "bars such claims by one employee against a fellow employee." Wellington filed a similar motion

---

[5] Section 24 of chapter 152 of the Annotated Laws of Massachusetts provides: "An employee shall be held to have waived his right of action at common law or under the law of any other jurisdiction in respect to an injury that is compensable under this chapter, to recover damages for personal injuries, if he shall not have given his employer, at the time of his contract of hire, written notice that he claimed such right, or, if the contract of hire was made before the employer became an insured person or self-insurer, if the employee shall not have given the said notice within thirty days of the time said employer became an insured person or self-insurer. An employee who has given notice to his employer that he claimed his right of action as aforesaid may waive such claim by a written notice, which shall take effect five days after it is delivered to the employer or his agent. The notices required by this section shall be given in such manner as the department may approve. If an employee has not given notice to his employer that he preserves his right of action at common law as provided by this section, the employee's spouse, children, parents and any other member of the employee's family or next of kin who is wholly or partly dependent upon the earnings of such employee at the time of injury or death, shall also be held to have waived any right created by statute, at common law, or under the law of any other jurisdiction against such employer, including, but not limited to claims for damages due to emotional distress, loss of consortium, parental guidance, companionship or the like, when such loss is a result of any injury to the employee that is compensable under this chapter." See also *Saab* v. *Massachusetts CVS Pharmacy, LLC*, 452 Mass. 564, 567, 896 N.E.2d 615 (2008) ("[i]n exchange for the possibility of obtaining compensation for loss of wages or earning capacity caused by a work-related injury, regardless of the fault of their employers or the foreseeability of harm, the act requires that participating employees waive their right to sue in tort for work-related injuries" [internal quotation marks omitted]).

We note that there is nothing in the record to indicate that the decedent provided written notice that he intended to reserve the common-law rights against the decedent's employer as provided by Mass. Gen. Laws Ann. c. 152, § 24 (2000). See *Mendes* v. *Tin Kee Ng*, 400 Mass. 131, 132, 507 N.E.2d 1048 (1987). The president of Wellington, James Murphy, stated in an affidavit that the decedent never provided such notice.

for summary judgment on January 7, 2008. The plaintiff objected to those motions.

The court, *Shapiro, J.*, heard argument on both summary judgment motions on June 4, 2008, and issued its decision on August 4, 2008. It began its analysis with a discussion on the choice of law issue and highlighted the significant difference between Connecticut and Massachusetts law with respect to the exclusive aspect of workers' compensation. "Connecticut and Massachusetts law differ as to whether claims are barred against a fellow employee where the action is based on the fellow employee's negligence in the operation of a motor vehicle. General Statutes § 31-293a provides in relevant part [that] [i]f an employee or, in the case of his death, his dependent has a right to benefits or compensation under this chapter on account of injury or death from injury caused by the negligence or wrong of a fellow employee, such right shall be the exclusive remedy of such injured employee or dependent and no action may be brought against such fellow employee unless . . . the action is based on the fellow employee's negligence in the operation of a motor vehicle . . . . In contrast, Mass. Gen. Laws c. 152, § 24, concerning claims against employers, which also applies to a claim by an employee who is injured in the course of employment against a fellow employee acting in the course of employment, provides no such exception. See *Mendes* v. *Tin Kee Ng*, 400 Mass. 131, 132, 507 N.E.2d 1048 (1987)."[6]

The court, using the "most significant relationship test" as established by our Supreme Court in *Jaiguay*

---

[6] See also *Saharceski* v. *Marcure*, 373 Mass. 304, 305, 366 N.E.2d 1245 (1977) (in case in which employee injured as result of negligent operation of motor vehicle by coemployee, if relevant circumstances all related to Massachusetts, then plaintiff not entitled to recover from negligent coemployee; if relevant circumstances all related to Connecticut, then plaintiff would be entitled to recover from coemployee).

v. *Vasquez*, 287 Conn. 323, 350, 948 A.2d 955 (2008), concluded that Massachusetts law governed. Accordingly, pursuant to Massachusetts law, no motor vehicle exception existed with respect to the exclusive nature of the workers' compensation law. The court then determined that Silva and the decedent were joint employees and, therefore, coemployees of Wellington, L & J or both and that, when the accident occurred, they were returning to Massachusetts from a job site in New York and, thus, were acting in the course of their employment. Therefore, the court granted the motions for summary judgment. This appeal followed. Additional facts will be set forth as necessary.

I

The plaintiff first claims that the court improperly determined that Massachusetts law, rather than Connecticut law, applied to the present case. Specifically, he argues that the court (1) should not have applied retroactively our Supreme Court's decision in *Jaiguay* and (2) improperly concluded, even if *Jaiguay* applies, that Massachusetts law governed the present case. We reject both of these arguments.

A

The plaintiff argues that the court should not have applied retroactively our Supreme Court's decision in *Jaiguay*. Specifically, he contends that "[a]ll parties have proceeded during the pendency of this matter with the reasonable belief that *Cleveland* v. *U.S. Printing Ink, Inc.*, 218 Conn. 181, 187, 588 A.2d 194 (1991), provided the applicable framework by which the court would decide which state's laws are applicable to the matter at hand." Further he maintains that, pursuant to the three-pronged test set forth in *Neyland* v. *Board of Education*, 195 Conn. 174, 179–80, 487 A.2d 181 (1985), the holding in *Jaiguay* should not have been applied retroactively. The defendants counter that the

plaintiff's claim regarding the applicability of *Jaiguay* was raised for the first time on appeal and that review of such claim is barred by the invited error doctrine. We agree with the defendants and decline to review the merits of this claim.

The following additional facts are necessary for our discussion. Silva's motion for summary judgment was filed on January 4, 2008. Wellington filed its motion for summary judgment three days later on January 7, 2008. The plaintiff filed his objection to both motions on May 6, 2008. The court held a hearing on the summary judgment motions on June 4, 2008. Our Supreme Court's decision in *Jaiguay* was released officially on June 17, 2008.

The plaintiff filed a motion, dated June 13, 2008, for permission to file supplemental briefs and to present supplemental argument in opposition to the defendants' motions for summary judgment. The motion argued that the supplemental material was necessary as a result of the *Jaiguay* decision. The motion stated: "Due to this radical change in the choice of law analysis governing this case, this [c]ourt should allow the plaintiff to file a supplemental brief as to *the impact of Jaiguay v. Vasquez [supra, 287 Conn. 323] on the pending motions for summary judgment.* Further, this [c]ourt should allow the plaintiff to present oral argument . . . *on the application of the Supreme Court's new rule to the facts of this case* prior to this [c]ourt's entry of an order relating to the defendants' motions for summary judgment." (Emphasis added.)

On the same date, the plaintiff filed a motion for discovery pursuant to Practice Book § 13-26 et seq. This motion noted the release of *Jaiguay* and claimed that further discovery was necessary for this new choice of law test. In his reply brief in support of the motion for permission to file supplemental briefs and to present

supplemental argument, dated June 23, 2008, the plaintiff argued: *"As a result of the Connecticut Supreme Court's decision in Jaiguay, this [c]ourt will not have the opportunity to resolve the dispute between the parties as to whether Connecticut substantive law, as expressed in Cleveland v. U.S. Printing Ink, Inc., [supra, 218 Conn. 181], should apply in this case based solely upon the fact that the subject accident occurred in Connecticut."* (Emphasis added.) This reply further argued that the factors listed in *Jaiguay* would determine the proper choice of law analysis. These factors, taken from the Restatement (Second) of Conflict of Laws, then were discussed. The plaintiff expressly stated that to apply the test of *Jaiguay*, further argument was necessary. These arguments were restated in the plaintiff's reply brief in support of his motion for discovery, also dated June 23, 2008.

"This court routinely has held that it will not afford review of claims of error when they have been induced. [T]he term induced error, or invited error, has been defined as [a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the erroneous ruling. . . . It is well established that a party who induces an error cannot be heard to later complain about that error. . . . This principle bars appellate review of induced nonconstitutional and induced constitutional error. . . . The invited error doctrine rests [on principles] of fairness, both to the trial court and to the opposing party." (Internal quotation marks omitted.) *Snowdon* v. *Grillo*, 114 Conn. App. 131, 139, 968 A.2d 984 (2009); see also *E. Udolf, Inc.* v. *Aetna Casualty & Surety Co.*, 214 Conn. 741, 752, 573 A.2d 1211 (1990).

The plaintiff filed four motions in the trial court following the release of *Jaiguay*. His arguments in each motion clearly indicated that the new test articulated

in *Jaiguay* applied to the present case. The plaintiff never argued in the alternative that *Jaiguay* should not be applied; instead, he maintained that the court would not have the opportunity to decide the case on the law argued by the parties. To allow the plaintiff to now challenge the decision to apply *Jaiguay* would amount to an ambush of both the trial court and the defendants. Accordingly, we decline to review this argument on appeal.

### B

The plaintiff next argues that the court improperly concluded, even under *Jaiguay*, that Massachusetts law applied to the present case. Specifically, he contends that the proper result under the most significant relationship test is that Connecticut, and not Massachusetts, law controls. We are not persuaded.

As a preliminary matter, we set forth the applicable standard of review. Our Supreme Court has stated that "choice of law issues present questions of law over which our review is plenary." *American States Ins. Co.* v. *Allstate Ins. Co.*, 282 Conn. 454, 461, 922 A.2d 1043 (2007); see also *Burns* v. *Quinnipiac University*, 120 Conn. App. 311, 319 n.8, 991 A.2d 666, cert. denied, 297 Conn. 906, 995 A.2d 634 (2010).

We now turn to our Supreme Court's decision in *Jaiguay* v. *Vasquez*, supra, 287 Conn. 323. In that case, an employee of a New York corporation was killed while riding as a passenger in a vehicle operated by a coworker. Id., 325. Both employees were residents of New York, but the fatal accident occurred in Connecticut. Id., 326–27. New York law, like Massachusetts law, contains no exception to the workers' compensation exclusivity doctrine for actions arising out of the negligent operation of a motor vehicle. See id., 328. The trial court determined that New York law applied and

rendered summary judgment in favor of the defendants. Id.

Our Supreme Court stated: "A markedly different choice of law issue is posed, however, when . . . an injured employee brings a tort action that ostensibly falls within an exception to the exclusivity provisions of our Workers' Compensation Act [General Statutes § 31-275 et seq.]. In that category of cases, the choice of law question is not which state among one or more other states has a *sufficient* interest in having its statutes invoked for the benefit of the employee. The issue, rather, is which state's law, to the *exclusion* of the law of all other potentially interested states, is the governing or controlling law." (Emphasis in original.) Id., 347. The court observed that "[c]hoice of law must not be rendered a matter of happenstance, in which the respective interests of the parties and the concerned jurisdictions receive only coincidental consideration." (Internal quotation marks omitted.) Id., 349. Accordingly, it rejected the place of injury, or lex loci delicti, rule and adopted the most significant relationship test found in §§ 6 and 145 of the Restatement (Second) of Conflicts of Laws. Id., 349–50.

"We previously have summarized the most significant relationship test set forth in §§ 6 and 145 of the Restatement (Second) as follows. Subsection (1) of § 145 of the Restatement (Second) of Conflict of Laws provides that [t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6. 1 Restatement (Second), [supra, § 145 (1), p. 414]. Subsection (2) of § 6 of the Restatement (Second) of Conflict of Laws, in turn, provides: When there is no [statutory] directive, the factors relevant to the choice of the applicable rule of law include (a) the needs of the interstate

and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of a particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied. . . .

"For assistance in our evaluation of the policy choices set out in §§ 145 (1) and 6 (2) . . . we turn . . . to § 145 (2) . . . which establishes black-letter rules of priority to facilitate the application of the principles of § 6 to tort cases. . . . Subsection (2) of § 145 . . . provides: Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. These contacts are to be evaluated according to their relative importance with respect to the particular issue." (Citation omitted; internal quotation marks omitted.) *Jaiguay* v. *Vasquez*, supra, 287 Conn. 351–52; see also *Dugan* v. *Mobile Medical Testing Services, Inc.*, 265 Conn. 791, 801–802, 830 A.2d 752 (2003); *O'Connor* v. *O'Connor*, 201 Conn. 632, 650–52, 519 A.2d 13 (1986).

The trial court properly used the test set forth in *Jaiguay* to resolve the choice of law issue. At the time of the accident, the decedent and Silva were returning to Massachusetts from New York City, where they had been working on job sites for Wellington, L & J or both. No work had been performed in Connecticut; also, the work assignments had been made in Massachusetts, where the decedent and Silva had been hired and

received their pay. In other words, the employment relationship between the decedent, Silva, Wellington and L & J was centered in Massachusetts. Both Wellington and L & J are incorporated and based there, and the van driven by Silva was registered and insured in Massachusetts. Finally, the van was owned by Wellington.

We acknowledge that not all of the factors favor application of Massachusetts law. Both the decedent and Ferraro were residents of Rhode Island.[7] Prior to the accident, Ferraro consumed alcoholic beverages at the Seahorse Café, a bar located in Noank, Connecticut. The Seahorse Café is owned by Seahorse, Inc., a Connecticut corporation and its permittee, Robert Sader, was a Connecticut resident at the time of the accident. The accident occurred on Interstate 95 in Stonington.

Due to the nature and the location of the accident, factors (a) and (b) of § 145 (2) weigh in favor of applying Connecticut law. As a result of the location of the parties' employment relationship and the location of incorporation of both Wellington and L & J, factor (d) of § 145 (2) favors the application of Massachusetts law. Our Supreme Court has instructed that "it is the significance, and not the number, of § 145 (2) contacts that determines the outcome of the choice of law inquiry under the Restatement [Second] approach. As the concluding sentence of §145 (2) provides, [t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue." (Internal quotation marks omitted.) *Dugan* v. *Mobile Medical Testing Services, Inc.*, supra, 265 Conn. 803.

We agree with the reasoning of the trial court that "[t]he most significant factors are that (1) Wellington and L & J are headquartered in and employed [the decedent] and Silva in Massachusetts and, even though

---

[7] There has been no claim that Rhode Island law applies in this case.

their assignments took them out of Massachusetts to various other states, their work was assigned there; (2) the Wellington . . . van was registered in Massachusetts; and (3) both Wellington and L & J are Massachusetts corporations. Also, Silva resided there. . . . The sole reason why Silva drove into Connecticut from New York was to reach a destination in Massachusetts. The fact that Interstate 95 runs from New York City, through Connecticut, to Massachusetts, is the only reason why the . . . van was in Connecticut at the time of the accident. No one was performing work in Connecticut." (Citation omitted.)

Further, we note that James Murphy, the president of Wellington, submitted an affidavit attesting that Wellington did not have any facilities in Connecticut, that the decedent had been hired in Massachusetts and that his work was assigned in Massachusetts. In Silva's affidavit, he indicated that he also had been hired in Massachusetts and that his work assignments originated there.

We are required to consider the significance, rather than the number, of the elements of § 145 (2) in determining the outcome of the choice of law inquiry. See *Jaiguay* v. *Vasquez*, supra, 287 Conn. 353. After conducting this evaluation, we conclude that the trial court properly determined that Massachusetts had more substantial contact with the parties in this case. The employment relationship originated from and was located primarily in Massachusetts, and it was "mere happenstance" that the accident took place in Connecticut. See id.

We also agree with the trial court that the factors in § 6 (2) favor application of Massachusetts law. "In determining which state's law should apply under § 6 (2), we must review, inter alia, the respective policies

and interests of [the foreign state] and Connecticut in the controversy." Id.

In *Jaiguay*, our Supreme Court stated that while Connecticut has an interest in deterring drivers from violating its traffic laws, such an interest is diminished when the accident that occurs as a result of a violation of these laws does not involve a Connecticut resident. Id., 354; see also *O'Connor* v. *O'Connor*, supra, 201 Conn. 658. Further, this interest was satisfied by Ferraro's conviction, following a nolo contendere plea, of misconduct with a motor vehicle in violation of General Statutes § 53a-57 and operation of a motor vehicle while under the influence of alcohol in violation of General Statutes § 14-227a. See also *Jaiguay* v. *Vasquez*, supra, 287 Conn. 354.

We also note that our Supreme Court concluded that "Connecticut has little or no interest in vindicating its policy of permitting actions in accordance with the motor vehicle exception of § 31-293a when . . . Connecticut has no ties to any person or party involved in the accident. In contrast, because the parties' employment relationship is centered in New York, New York has a clear interest in ensuring that its contrary public policy is honored." Id. The rationale clearly applies to the present case. Although Ferraro consumed alcohol at a bar located in Connecticut, and owned and operated by entities with Connecticut ties, this connection to our state is less significant. The policy established by the Massachusetts legislature that does not include a motor vehicle exception to the exclusive nature of workers' compensation law presents a more significant interest. Finally, because there is no Connecticut connection— other than the fact that the accident "fortuitously occurred" here—to the employment relationship between the decedent, Silva, Wellington or L & J, those parties could not have expected to invoke Connecticut workers' compensation law. See id., 355. We also are

mindful of the statement from the Massachusetts Supreme Judicial Court that "[a]n employee covered under the Massachusetts Workmen's Compensation Act is afforded compensation for an injury which occurs outside the Commonwealth. [Mass. Gen. Laws c. 152, § 26]." *Saharceski* v. *Marcure*, 373 Mass. 304, 306, 366 N.E.2d 1245 (1977). This demonstrates Massachusetts' interest in ensuring that its residents are compensated under its workers' compensation scheme, even if the accident occurs outside the borders of the Commonwealth. For all these reasons, we conclude that the court properly determined that Massachusetts law applies to the facts of this case.

## II

The plaintiff next claims that the court improperly concluded that no genuine issue of material fact existed. He contends that even under Massachusetts law, the court improperly rendered summary judgment in favor of the defendants. Specifically, the plaintiff argues that issues of material fact existed with respect to the employment status of Silva and the decedent at the moment of the subject accident. We are not persuaded.

At the outset, we set forth our well established standard of review. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . On appeal, we must determine whether the legal conclusions reached by the trial court

are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court. . . . Our review of the trial court's decision to grant [a party's] motion for summary judgment is plenary." (Internal quotation marks omitted.) *Southwick at Milford Condominium Assn., Inc.* v. *523 Wheelers Farm Road, Milford, LLC*, 294 Conn. 311, 318, 984 A.2d 676 (2009).

A material fact is one that will make a difference in the case. *Double G.G. Leasing, LLC* v. *Underwriters at Lloyd's, London*, 116 Conn. App. 417, 426, 978 A.2d 83, cert. denied, 294 Conn. 908, 982 A.2d 1082 (2009). "Once the moving party has presented evidence in support of the motion for summary judgment, the opposing party must present evidence that demonstrates the existence of some disputed factual issue . . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court . . . ." (Internal quotation marks omitted.) *Byrne* v. *Burke*, 112 Conn. App. 262, 267–68, 962 A.2d 825, cert. denied, 290 Conn. 923, 966 A.2d 235 (2009).

We now set forth the relevant workers' compensation law from Massachusetts that guides our analysis. "The Workmen's Compensation Act provides that an employee may collect compensation for personal injur[ies] arising out of and in the course of his employment, or arising out of an ordinary risk of the street while actually engaged, with his employer's authorization, in the business affairs or undertaking of his employer. . . . [Mass. Gen. Laws] c. 152, § 26. An injury arises out of employment if it can be attributed to the nature, conditions, obligations or incidents of the employment; in other words, [to] the employment looked at in any of its aspects." (Internal quotation

marks omitted.) *Maguire's Case*, 16 Mass. App. 337, 339, 451 N.E.2d 446, review denied sub nom. *Maguire v. Commercial Union Assurance Co.*, 390 Mass. 1102, 453 N.E.2d 1231 (1983).

Professor Arthur Larson's treatise on workers' compensation states: "Once a workers' compensation act has become applicable . . . it affords the exclusive remedy for the injury by the employee . . . . This is part of the quid pro quo in which the sacrifices and gains of employees and employers are to some extent put into balance, for, while the employer assumes a new liability without fault, it is relieved of the prospect of large damage verdicts." 6 A. Larson & L. Larson, Workers' Compensation Law (2010) § 100.01, pp. 100-2 and 100-3. Massachusetts has followed this general rule with respect to the exclusive nature of workers' compensation law. "Workers' compensation is the exclusive remedy against employers and coemployees who commit tortious acts within the course of their employment and in furtherance of the employer's interest. . . . An employee is thus immune from tort liability under the [workers' compensation act], provided that his or her negligence that resulted in another employee's injury occurred in the course of employment. . . . Coemployees, however, may be sued for tortious acts committed outside the course of employment and for reasons unrelated to the interest of the employer. . . . An objective test is used to assess whether the coemployee acted in the course of employment or at least in part for a job-related purpose. . . .

"The course of employment test used in workers' compensation cases is much broader than the scope of employment test applied to determine whether a master is liable for a servant's negligent acts. . . . An employee has acted in the course of employment whenever he has, on the employer's premises, engaged in

conduct consistent with his contract of hire and pertinent or incidental to his employment. . . . Furthermore, an employee has acted in the course of employment even if he has more than one purpose for doing an act, as long as one significant purpose is related to the employment. . . . The relevant inquiry with respect to claims against coemployees is not whether the coemployee owned the equipment that caused the injury, but whether, at the time of the injury, the coemployee acted in some way related to his or her employment." (Citations omitted; internal quotation marks omitted.) *Fredette* v. *Simpson*, 440 Mass. 263, 266–67, 797 N.E.2d 899 (2003); see also *Brown* v. *Nutter, McClennen & Fish*, 45 Mass. App. 212, 214–16, 696 N.E.2d 953 (1998).

Silva's affidavit stated that in October, 2003, he was employed by Wellington as a foreman and that his work involved the installation of seating, including movie theater seats, stadium seating and classroom seating. The decedent also was employed by Wellington. Jobs were completed by crews of Wellington "and/or" L & J employees. In October, 2003, Silva and the decedent received paychecks from both Wellington and L & J. The work for which he received payment from L & J was the same type of work he performed for Wellington. He used the same tools, materials and techniques for the work. Additionally, he drove vans owned by Wellington for transportation to and from his assigned job sites.

Silva stated in his affidavit that on October 22, 2003, he was operating a van owned by Wellington at the time of the fatal accident. He was returning to Massachusetts from New York City, where he had performed work for Wellington "and/or" L & J. This work trip had originated on October 20, 2003, when Silva and the decedent were assigned together on a job site on Long Island in East Islip or Hicksville, New York. The sole purpose of the trip was to install seating for Wellington "and/or" L & J.

The plaintiff argues that a genuine issue of material facts exists as to whether the decedent was in the course of his employment for either company or on his own time at the time of the accident. He also contends that a factual issue exists with respect to the employment status of Silva at the time of the accident, specifically, whether he was employed by Wellington or L & J. We address each of these issues in turn.

A

We begin by considering the plaintiff's contention that the decedent, at the time of the accident, was not working for either company but, instead, was on his "own time." He argues that because of this disputed fact, the court improperly rendered summary judgment. We do not agree.

The plaintiff points to the fact that the decedent's work day had ended and that he was "at liberty to drink beer on the trip to Massachusetts." "Ordinarily, injuries occurring while the employee is going to and from a fixed place of work are not compensable." *Maguire's Case*, supra, 16 Mass. App. 339. This rule, however, is not applicable to the facts of the present case. "The going and coming rule (which precludes recovery for injuries sustained in travel to and from the place of employment) has no application to employees who have no fixed place of employment. . . . Where injuries are incurred while an employee is traveling and it appears that it was the employment which impelled the employee to make the trip, the risk of the trip is a hazard of the employment." (Citations omitted; internal quotation marks omitted.) *Frassa* v. *Caulfield*, 22 Mass. App. 105, 109–10, 491 N.E.2d 657, review denied, 398 Mass. 1101, 495 N.E.2d 310 (1986); see also *Caron's Case*, 351 Mass. 406, 409, 221 N.E.2d 871 (1966); *Allen* v. *Board of Selectmen*, 15 Mass. App. 1009, 1010, 448

N.E.2d 782 (1983) (homeward bound trip may constitute essential part of mission for employer).

A brief discussion of the decision of the Massachusetts Appeals Court in *Frassa* v. *Caulfield,* supra, 22 Mass. App. 105, will facilitate our analysis. In that case, the plaintiff's decedent, Richard D. Frassa, and the defendant, Richard J. Caulfield, were employees of an accounting firm and were assigned to conduct an audit at a private school. Id., 106. They traveled from Massachusetts to New Hampshire and lodged at the school but were required to take their evening meals elsewhere. Id. One night, they drove for dinner to a restaurant that was located thirty to forty-five minutes from the school, then drove thirty minutes to another establishment where they listened to a band and consumed some beer. Id. They then drove to another location where they played games of air hockey and spent time in a lounge. Id. On their trip back to the school, Caulfield failed to negotiate a turn in the road, and the vehicle tipped over, resulting in the death of Frassa. Id.

After resolving a conflict of law issue, the Massachusetts Appeals Court addressed the issue of whether Frassa and Caulfield were acting in the course of their employment at the time of the fatal accident. The court noted that "[a]n injury arises out of the employment if it arises out of the nature, conditions, obligations or incidents of the employment; in other words, *out of the employment looked at in any of its aspects.*" (Emphasis added.) Id., 110. The court then stated: "We think there is no question that during reasonable travel to and from the evening meal on the night of the accident, travel clearly impelled by the nature and conditions of the employment, Frassa and Caulfield were acting in the course of their employment." Id. The court declined to determine whether the two men could have been considered acting in the course of their employment with respect to the places they visited *after* dinner

because Frassa was not injured during *those* activities. Id., 111. The court focused on the location of the accident, which was within a ten minute drive from the school where they were performing the audit for their employer. Id., 112. Ultimately, the court concluded that under these circumstances, Frassa and Caulfield were acting in the course of their employment at the time of the accident. Id., 112–13.

In the present case, the decedent and Silva had completed their duties for Wellington "and/or" L & J at approximately 4 p.m. on the date of the accident. They ate dinner at a restaurant in New York City, and each consumed a can of beer. Each person paid for his own meal with cash.[8] Silva received a telephone call from Murphy, who instructed them to return "home." Silva operated a van owned by Wellington for the return trip to Massachusetts.[9] He stopped in Connecticut for fuel for the vehicle. The decedent and Robert Sullivan, another employee, had been drinking beer on the trip from New York. While Silva was refueling, Sullivan purchased some beer at a package store, which he and the decedent proceeded to drink. Silva did not have any beer after he left New York City.

---

[8] The Colorado Court of Appeals has stated that "[t]he traveling employee doctrine does not distinguish between salaried and non-salaried workers; nor does the doctrine depend upon the employee being compensated by the employer for transportation, lodging, and meals. While these factors may be indicative of business travel when that is an issue in dispute, the absence of one or more of these factors does not, in and of itself, disqualify a claimant from receiving benefits." (Internal quotation marks omitted.) *Phillips Contracting, Inc.* v. *Hirst*, 905 P.2d 9, 12 (Colo. App. 1995).

[9] "Under the first clause of the second sentence of [Mass. Gen. Laws] c. 152, § 26, it is conclusively presumed that any person, while operating or using a motor or other vehicle, whether or not belonging to his employer, with his employer's general authorization or approval, in the performance of work in connection with the business affairs or undertakings of his employer . . . and while so performing such work, receives a personal injury, is an employee." (Internal quotation marks omitted.) *Caron's Case*, supra, 351 Mass. 409.

Pursuant to the reasoning set forth in *Frassa*, we do not agree with the plaintiff's contention that because the decedent had completed his work for the day or because he had consumed beer at dinner and during the drive to Massachusetts, he was no longer in the course of his employment for the purpose of workers' compensation coverage. Under Massachusetts law, the homeward bound trip is part of the course of employment. *Allen* v. *Board of Selectmen*, supra, 15 Mass. App. 1010; see also *Caron's Case*, supra, 351 Mass. 409; *Hayes* v. *Lumbermens Mutual Casualty Co.*, 310 Mass. 81, 84, 37 N.E.2d 121 (1941) (journey where accident occurred not merely for pleasure or convenience of employee but incidental to employment). Such a trip is considered to be one of the aspects of employment and therefore within the scope of workers' compensation. *Papanastassiou's Case*, 362 Mass. 91, 93–94, 284 N.E.2d 598 (1972). Furthermore, there is a "well-settled rule that traveling employees are generally within the course of their employment from the time they leave home on a business trip until they return, for the self-evident reason that the traveling itself is a large part of the job." 1 A. Larson & L. Larson, supra, § 14.01, p. 14-2. Generally, injuries suffered by traveling employees while driving are compensable under workers' compensation. 2 A. Larson & L. Larson, supra, § 25.03 [1], p. 25-4. As a result, however, Massachusetts workers' compensation provides the exclusive remedy against the decedent's employer, whether it was Wellington or L & J. 6 A. Larson & L. Larson, supra, § 100.01, p. 100-2; see also Mass. Gen. Laws Ann. c. 152, § 24 (2000); *Brown* v. *Nutter, McClennen & Fish*, supra, 45 Mass. App. 214–15.

### B

We next address the plaintiff's contention that the decedent was not a coemployee of Silva at the time of the accident. Specifically, he argues that a genuine issue of material fact existed with respect to the specific

company that the decedent and Silva worked for on the day of the accident. According to the plaintiff, it therefore was improper to render summary judgment as to his claims against Silva because a dispute exists as to whether Silva and the decedent were coemployees at the time of the accident. We do not agree.

The trial court concluded that, at the time of the accident, Silva and the decedent were employees of both companies for the purpose of workers' compensation. Specifically, the court relied on the doctrine of joint employment to support its conclusion that Silva and the decedent were employees of both companies. We agree with this conclusion.

"When a single employee works for two or more employers, an arbitrary two-way classification distinguishing 'joint employment' and 'dual employment' helps to sort out these almost infinitely varied cases. Joint employment occurs when a single employee, under contract with two employers, and under the simultaneous control of both, simultaneously performs services for both employers, and when the service for each employer is the same as, or is closely related to, that for the other. In such a case, both employers are liable for workmen's compensation. . . .

"Joint employment is possible, and indeed fairly common, because there is nothing unusual about the coinciding of both control by two employers and the advancement of the interests of two employers in a single piece of work." 3 A. Larson & L. Larson, supra, § 68.01, pp. 68-1 and 68-2. Professor Larson states that courts have shown an increased tendency to dispose of close cases by finding joint employment. Id., § 68.02, p. 68-2. *"Joint employment may also be found when work is performed for affiliated or closely related corporations or businesses,* or where a maze of complex documentation between two firms prevents the court

from clearly seeing whose employee the injured worker really is." (Emphasis added.) Id., § 68.03, p. 68-4.

In *Williams* v. *Westover Finishing Co.*, 24 Mass. App. 58, 60, 506 N.E.2d 166, review denied, 400 Mass. 1102, 508 N.E.2d 620 (1987), the Massachusetts Appeals Court, relying in part on the Larson treatise, discussed the issue of joint employment. In *Williams*, the decedent, Bertha Williams, died as a result of a fall at a building in the course of her employment. Id., 58. Two defendants, a finishing company and a knitting company, occupied the building where Williams had been employed. Id., 59. These two companies were "sibling corporations, with the same officers, directors, and shareholders." Id. The knitting company occupied the upper part of the building and made cloth, while the finishing company used the lower part and dyed, dried, applied certain chemicals and ironed the cloth. Id. The purpose for the dual companies was, in part, to take advantage of a lower workers' compensation insurance rate. Id.

At the time of Williams' injury, she had been working in the basement performing a task for the finishing company. Id. Williams believed that she had been employed by the knitting company; however, over a three year period she had received payment from both companies. Id. The jury found that she had been employed by both companies at the time of her accident. Id., 59–60. The Massachusetts Appeals Court concluded that this finding was not improper, especially in light of the fact that "[t]he operations of the two companies were very closely integrated, and the line between them was not clear." Id., 60. As a result of this joint employment, the claims of Williams and her husband and children were barred by the exclusive nature of workers' compensation. Id.

Applying the reasoning of the *Williams* case to the matter before us, we conclude that the trial court properly determined that the doctrine of joint employment applied. Both Wellington and L & J are involved in the installation of seating. Murphy, the owner of Wellington, Raymond Audet, an owner of L & J,[10] and Silva were the " 'lead guys' " at both companies. Additionally, the companies shared employees, equipment, tools, materials and techniques. During the trip to New York, Silva and the decedent performed work for both companies. The affidavit of Kara Murphy stated that Silva and the decedent received payment from L & J for work done on October 22, 2003, the date of the accident. James Murphy's affidavit stated that Silva and the decedent were employed by Wellington on that date. Cherilyn Maltais, the bookkeeper for Wellington, submitted an affidavit indicating that Silva and the decedent received income from Wellington for work completed in New York on October 20 and 21, 2003.

We also are mindful of Mass. Gen. Laws Ann. c. 152, § 26B (2000), which provides in relevant part: "When an employee employed in the concurrent service of two or more insured employers receives a personal injury compensable under this chapter while performing a duty which is common to such employers, the liability of their insurers under this chapter shall be joint and several. . . ." The undisputed facts show that, during the course of the trip, the decedent and Silva performed similar services related to the business of seat installation for both Wellington and L & J. The line between the two companies was not clearly defined. See *Williams* v. *Westover Finishing Co.*, supra, 24 Mass. App. 60. Further, the return trip home constitutes a part of the course of employment for both of these companies. See, e.g., *Mendes* v. *Tin Kee Ng*, supra, 400 Mass. 135.

---

[10] Audet testified that he is also an owner of L & J, along with Kara Murphy, Katie Murphy and Jennifer Murphy.

We conclude that the trial court properly determined that, for purposes of workers' compensation, Silva and the decedent were joint employees at the time of the accident. Thus, the plaintiff is barred by Massachusetts law from bringing an action against Silva. Accordingly, the court properly granted the motions for summary judgment.

## III

The plaintiff's final claim is that the court improperly prevented him from conducting discovery.[11] Specifically, he argues that the court abused its discretion[12]

---

[11] The plaintiff also argues that (1) Wellington and Silva had an obligation, pursuant to Practice Book § 17-44, to notify the court and the plaintiff of their intentions to file motions for summary judgment and (2) he improperly was prevented from deposing Silva a second time. We conclude that the plaintiff abandoned these arguments as a result of an inadequate brief. "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Baranowski* v. *Safeco Ins. Co. of America*, 119 Conn. App. 85, 89 n.4, 986 A.2d 334 (2010). Specifically, the plaintiff has failed to provide the requisite legal analysis, with citation to authority, to demonstrate why these actions constituted an abuse of the court's discretion.

The plaintiff further contends that the court abused its discretion by preventing further discovery following the release of *Jaiguay* v. *Vasquez*, supra, 287 Conn. 323, by our Supreme Court. Specifically, the plaintiff argues that "additional discovery was necessary to clarify the employment relationship of the parties, the relationship between the two companies, and the financial responsibilities of each corporation to Silva and [the decedent] . . . ."

The trial court had determined that the parties argued and briefed extensively the choice of law issue, including the applicability of *Snyder* v. *Seldin*, 81 Conn. App. 718, 722, 841 A.2d 701 (2004), which used the same test as *Jaiguay*. Because *Snyder* was released in 2004, "the parties had a full opportunity to conduct discovery in order to discover relevant facts bearing on the choice of law issues. Nothing decided in *Jaiguay* requires different discovery than was required under the previous appellate decisions. Additional time to conduct discovery is not warranted." Nothing in the plaintiff's appellate brief persuades us that this reasoning constituted an abuse of discretion.

[12] For such procedural issues, we use Connecticut law. See, e.g., *Wyatt Energy, Inc.* v. *Motiva Enterprises, LLC*, 104 Conn. App. 685, 689, 936 A.2d

by refusing to allow him to depose Kara Murphy and Cherilyn Maltais. We disagree.

The following additional facts and procedural history are necessary for the resolution of this issue. On March 7, 2007, the court, *Beach, J.*, issued a scheduling order memorializing an agreement of the parties. Pursuant to this order, depositions of fact witnesses were to be completed on or before July 1, 2007. The order further required that any dispositive motion was to be filed by November 30, 2007, which the court later extended until December 31, 2007. On November 9, 2007, the plaintiff's counsel served notices of depositions to Kara Murphy and Maltais for December 3, 2007. On November 16, 2007, Wellington filed a motion for a protective order to prevent the plaintiff from conducting those depositions. It argued, inter alia, that the notices were untimely pursuant to the court's scheduling order. The plaintiff filed his objection to the motion for a protective order on November 28, 2007. The plaintiff also filed a motion for the issuance of a commission to take an out-of-state deposition. In a subsequent pleading, the plaintiff represented that the December 3, 2007 deposition of Kara Murphy had been cancelled as a courtesy to allow her time to obtain counsel to represent her at the deposition. The deposition was renoticed for December 11, 2007. The plaintiff further alleged that Murphy refused to testify at the December 11, 2007 deposition, citing the lack of counsel.

At a hearing on January 8, 2008, attorney Nicole C. Chomiak, on behalf of Wellington, stated to the court: "There was no contemplation—and we have been a little bit loose on the discovery deadlines, and I will agree to that. However, what we have been loose on is scheduling already contemplated depositions. For

280 (2007), cert. denied, 286 Conn. 901, 943 A.2d 1103 (2008). We also note that no party has advocated otherwise.

example, the plaintiff's expert toxicologist kept on getting rescheduled, rescheduled, and no one really made an issue about the deadline. *But the issue of deposing Maltais and [Kara] Murphy had never even been brought up. It was not even contemplated until after the status conference on November 9, [2007] when I reported to Judge Beach I would be filing a motion for summary judgment.*" (Emphasis added.)

The court questioned Chomiak regarding written wage statements from Wellington and L & J that had been notarized in September, 2005, and sent at some point to the plaintiff's counsel. Chomiak represented to the court that she discussed with Ronald B. Resetarits, a member of the plaintiff's counsel's firm, using these wage statements in lieu of deposing Kara Murphy. Kara Murphy went on maternity leave right after April, 2005, and these notarized statements were provided upon her return. Chomiak stated that Resetarits agreed to accept a wage statement from Kara Murphy in lieu of deposing Kara Murphy and Maltais.

The court then inquired of the details regarding Kara Murphy's refusal to testify on December 11, 2007. Chomiak represented to the court that, on the day before the deposition, Kara Murphy stated that an insurance agent of L & J spoke with Jason Crawford, one of the plaintiff's attorneys, and that they had reached an agreement that the deposition would not take place. Later that night, Chomiak stated that she received an e-mail from attorney Robert Reardon, indicating that he would conduct the deposition on behalf of the plaintiff. Upon direct questioning from the court, Chomiak stated that it was her belief that an agreement had been reached that the deposition would not go forward.

Reardon then presented his oral argument to the court. He stated that there was no agreement to postpone the scheduled deposition and that the insurance

agent knew that as well. He further indicated that all counsel, as well as the insurance agent, showed up for the deposition.[13] Reardon also indicated that he never agreed, in 2005, to accept written or notarized statements in lieu of depositions.

On January 15, 2008, the court, *Shapiro, J.*, issued its memorandum of decision. It stated that the plaintiff had not noticed the depositions of Kara Murphy and Maltais until after learning of Wellington's intention to file for summary judgment on November 9, 2007. The court determined that the plaintiff was aware of the employment issues and the need to depose Kara Murphy and Maltais in early January, 2006, nearly eighteen months before the July 1, 2007 scheduling order. The court granted the motion for a protective order and denied the plaintiff's motions for commissions to take out-of-state depositions.

On February 4, 2008, the plaintiff, pursuant to Practice Book § 11-12, filed a motion for permission to reargue the court's January 15, 2008 decision. Specifically, the plaintiff argued that the court improperly stated that the plaintiff had noticed the deposition of Kara Murphy and Maltais for the first time in November, 2007. In support, the plaintiff submitted an affidavit from Resetarits, who indicated that he had noticed depositions of Kara Murphy and Maltais on June 23, 2005, on behalf of the plaintiff. He further stated that he received a letter from Chomiak on July 5, 2005, stating that she was cancelling the deposition of Kara Murphy as a result of her pregnancy and that Chomiak would not permit the Maltais deposition to proceed in Connecticut. According to Resetarits, Chomiak subsequently sent him wage records of Silva and the decedent

---

[13] We note that the court did not make any specific factual findings as to the events pertaining to the December 11, 2007 deposition and that no party filed a motion for articulation pursuant to Practice Book § 66-5.

for both Wellington and L & J for the relevant time frame and eventually a notarized copy of those records. Resetarits claimed that he never intended to accept the notarized statements in lieu of deposing Kara Murphy and Maltais and never waived the right to do so. Finally, he indicated that further discovery was "put on hold" due to Ferraro's invocation of her fifth amendment rights.

Chomiak, on behalf of Wellington, filed an objection to the plaintiff's motion to reargue on February 13, 2008. In this objection, Wellington conceded that the depositions of Kara Murphy and Maltais had been noticed in June, 2005. Wellington argued, however, that the exhibits attached to the plaintiff's motion to reargue demonstrated that the wage records alleviated the need to depose Kara Murphy and Maltais.

On April 16, 2008, the court issued its memorandum of decision on the plaintiff's motion to reargue. The court explained that its statement that the depositions first were noticed in November, 2007, was based on the response of the plaintiff's counsel during the January 8, 2008 oral argument.[14] As a result, the plaintiff "should not be allowed to claim as error that which his own action has induced. (Internal quotation marks omitted.) *Suarez* v. *Dickmont Plastics Corp.*, 242 Conn. 255, 267, 698 A.2d 838 (1997)."

---

[14] During the hearing the following colloquy occurred:

"[The Plaintiff's Counsel]: I don't mean to be hypertechnical, but it becomes important—actually, if I may, Your Honor, it becomes important because there are a number of facts that you have not heard in argument which would considerably—present a considerably different scenario that we were faced with at the time we first noticed these depositions. First of all—

"The Court: And that was November 9?

"[The Plaintiff's Counsel]: Yes.

"The Court: Right after you were here before Judge Beach in Middletown?

"[The Plaintiff's Counsel]: That's correct, Your Honor."

The court then noted that it found unpersuasive the plaintiff's conclusion that, after receiving the accounting statements, the deposition testimony of Kara Murphy and Maltais was " 'essential' . . . ." It also noted that these depositions could have been taken during Ferraro's assertion of her right against self-incrimination. Accordingly, it concluded that the plaintiff had failed to show that he was prevented from taking the depositions of Kara Murphy and Maltais in a timely manner and denied the motion to reargue.

"Our Supreme Court has long recognized that the granting or denial of a discovery request rests in the sound discretion of the [trial] court, and is subject to reversal only if such an order constitutes an abuse of that discretion. . . . [I]t is only in rare instances that the trial court's decision will be disturbed." (Internal quotation marks omitted.) *Zoll* v. *Zoll*, 112 Conn. App. 290, 299, 962 A.2d 871 (2009); see also *Barry* v. *Quality Steel Products, Inc.*, 280 Conn. 1, 16–17, 905 A.2d 55 (2006).

The allegations in the present case regarding the various discovery issues are of concern. See, e.g., *Clark* v. *H.O. Penn Machinery*, Superior Court, judicial district of New Britain, Docket No. CV-01-05082475 (May 22, 2002) ("[w]e spend much time discussing the issue of civility in our profession and in our courts"). It is undisputed that inaccurate information was provided to and relied on by the court with respect to the 2005 attempts to depose Kara Murphy and Maltais. Although the trial court did not make any findings as to these matters, we use this opportunity to stress the importance of accuracy when making representations to the court.[15]

---

[15] Our Supreme Court has stated that "not every criticism by a judge that offends a lawyer's sensibilities is a sanction. . . . Courts, of course, must have considerable leeway to express their displeasure with the conduct of counsel. Thus, judges retain the power to comment . . . on a lawyer's performance . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Perez*, 276 Conn. 285, 301, 885 A.2d 178 (2005).

We conclude, however, that the court did not abuse its discretion in granting the motion for a protective order and preventing the plaintiff from taking out-of-state depositions of Kara Murphy and Maltais. As the court reasoned, the plaintiff had nearly eighteen months, from the time it received Wellington's answer until the July 1, 2007 deadline per the scheduling order, to depose these witnesses. The court stated that "[t]he factual dispute was clearly joined and the plaintiff put on notice of it when the plaintiff received Wellington's January 4, 2006 answer . . . to the plaintiff's revised amended complaint, dated November 14, 2005 . . . ." The court also rejected the plaintiff's argument that it was necessary to first depose Ferraro. "[T]he issues about which the plaintiff seeks to depose [Kara] Murphy and Maltais, concerning [the decedent] and Silva's employment, and whether Silva was acting within the scope of his employment when he was driving the vehicle in which [the decedent] was a passenger, are unrelated to the plaintiff's claims against Ferraro, the driver of the other vehicle." The plaintiff has failed to establish that this reasoning constituted an abuse of discretion.

The judgment is affirmed.

In this opinion the other judges concurred.